**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
EMANUEL KARROPOULOS
                Plaintiff,

       -against-

SOUP DU JOUR, LTD., doing business as
Bistro 44, and PAUL J. GALLOWITSCH, JR.,
                Defendants.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
13-CV-4545 (ADS) (GRB)

<u>**APPEARANCES:**</u>

**Neil H. Greenberg & Associates, P.C.**
*Attorneys for the Plaintiff*
900 Merchants Concourse, Suite 214
Westbury, NY 11590
      By: Neil H. Greenberg, Esq.
         Justin M. Reilly, Esq.
         Michael Henry Ricca, Esq., Of Counsel

**Kaufman, Dolowich, Voluck & Gonzo, LLP**
*Attorneys for the Defendants*
135 Crossways Park Drive, Suite 201
Woodbury, NY 11797
      By: Jeffery Alan Meyer, Esq.
         Angel R. Sevilla, Esq.
         David Adam Tauster, Esq.
         Rachel B. Jacobson, Esq., Of Counsel

**SPATT, District Judge**.

    This case arises from a dispute over whether the Plaintiff Emanuel Karropoulos (the

"Plaintiff"), who was employed as an executive chef from 2010 to 2013 by the Defendants Soup

du Jour, Ltd., d/b/a Bistro 44, and Paul J. Gallowitsch, Jr., ("Gallowitsch, Jr." and collectively,

the "Defendants"), should be paid overtime wages under the Fair Labor Standards Act, 29 U.S.C.

§ 201, *et seq.* (the "FLSA"), and New York Labor Law § 650, *et seq*. (the "NYLL").

On August 13, 2013, the Plaintiff commenced this action seeking monetary damages, including an award of liquidated damages, pre-judgment and post-judgment interest, restitution, and reasonable attorneys' fees.

Presently before the Court is a motion by the Defendants pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 for summary judgment dismissing the complaint in its entirety.

For the reasons set forth below, the Court denies the Defendants' motion.

## I. BACKGROUND

Unless otherwise specified, the following facts are drawn from the parties' Rule 56.1 statements.

### A. The Parties

The Plaintiff is a resident of East Northport, New York. (Compl. at ¶ 5; Answer at ¶ 5.) From January 2010 to May 2013, the Plaintiff was employed as an executive chef at Bistro 44 by the Defendants. Bistro 44 is a restaurant located at 44 Maine Street in Northport, New York. It specializes in "New American" cuisines, and when the Plaintiff worked there, the menu included items such as, "Glazed Pork Loin, Cioppino, and Braised Beef Short Ribs in a Pinot Noir Reduction." (See Meyer Decl., Ex. N.)

The Defendant Gallowitsch is the Vice President of the Defendant Soup Du Jour, Ltd., a corporation that owned and operated Bistro 44 before selling it on May 15, 2014 to the Jokal Corporation. (Pl.'s Ex. C, at Tr. 9:6–9.)

Paul Gallowitsch, Sr., the Defendant Gallowitsch's father, is the President of Soup Du Jour, Ltd. He is not a party to this action.

**B. The Plaintiff's Employment Background**

In 1996, the Plaintiff received a two-year associate's degree from the American Culinary Institute ("ACI"). (Meyer Decl., Ex. B, at Tr. 19–24.) After graduating from ACI, he worked at Little Palm Island, a restaurant in the Florida Keys, at the "pantry station," and as a line cook at the Hard Rock Café. (Id.)

In 1997, the Plaintiff moved back to New York and worked for a year and a half at the Pine Hollow Country Club ("Pine Hollow"). (Id. at Tr. 30:9–18.) The record does not make clear what his job title or duties were at Pine Hollow.

From 1998 to 1999, the Plaintiff held odd jobs at the Marriott Hotel; Hampton Clambake, a catering company; and performed "scattered" jobs in the construction industry. (Id. at Tr. 30:14–6.)

In 1999, Gallowitsch, Sr. hired the Plaintiff as a line cook for his restaurant Soup Du Jour Bistro, the predecessor to Bistro 44. (Id. at Tr. 24:5–13.) From 2001 to 2002, the Plaintiff worked as a line cook at Skipper**s**, another restaurant owned by Gallowitsch, Sr. (Id. at Tr. 24:14–19.)

In 2002, the Plaintiff moved to San Diego and took a job as an executive chef at Café Athena. During his tenure at Café Athena, it was "rated by Zagat as the Best Greek Restaurant in San Diego." (Joint 56.1 Statement, Dk. No. 30, at ¶ 6.)

In 2004, the Plaintiff moved back to New York and became the executive chef at Via Veneto, a restaurant located in Jericho. (Meyer Decl., Ex. G.) An April 18, 2004 article which appeared in Newsday described the Plaintiff's job at Via Veneto as follows: "Karropoulos, 28, is responsible for menu selection, food preparation, creating daily specials, inventory and overseeing four cooks. He also manages special events." (Id.)

In 2009, the Plaintiff left Via Veneto and worked as a sales representative for Sysco Corporation ("Sysco"). (<u>Id.</u> at Tr. 27:11–20.) During this period he was also performing odd jobs in the construction injury. (<u>Id.</u>)

In January 2010, Gallowitsch, Sr. called the Plaintiff to let him know that he was planning to re-open Bistro 44 and invited him to interview for the executive chef position. (Pl.'s Ex. D at Tr. 97:9–16; Meyer Decl., Ex. B, at Tr. 38:5–14.) When asked why he called the Plaintiff, Gallowitsch, Sr. testified, "I chose him right away because I did always enjoy his cooking. He's a great, talented executive chef. His food is really good." (Pl.'s Ex. D, at Tr. 100:2–4.) After the phone call, the Plaintiff had lunch with Gallowitsch, Sr., his wife, and the Defendant Gallowitsch, Jr. Following the lunch, Gallowitsch, Sr. hired the Plaintiff as the executive chef at Bistro 44. (Meyer Decl., Ex. B, at Tr. 38:5–14.)

### C. The Plaintiff's Compensation at Bistro 44

The parties agree that the Plaintiff was paid a salary and was not paid overtime. They further agree that each week, the Defendant received a pay check of at least $900 before taxes.

In addition, when he started working at Bistro 44 in January 2010, the Plaintiff received an additional $400 in cash every week. (Meyer Decl., Ex. B, at Tr. 16:3–11.) After two months of working, he received a raise of $100 per week in cash. (<u>Id.</u> at Tr. 11–20.) Therefore, as of March 2010, two months after being hired, the Plaintiff's gross salary prior to taxes was $1,400 per week, which amounted to an annual gross salary of $72,800. (Pl's Ex. C, at Tr. 14:19–25; 15:2–19; Ex. D, at Tr. 88:2–12.)

However, the parties dispute whether the Plaintiff's salary was subject to deductions during his employment. The Defendants assert that the Plaintiff's weekly check was not subject to deductions. (Joint 56.1 Statement, Dkt. No. 30, at ¶ 9.)

On the other hand, the Plaintiff asserts that his salary was subject to deductions on several occasions. For example, the Plaintiff testified that in December 2010, he asked the Defendant Gallowitsch, Jr. if he could receive a weekly pay check for his full salary of $1,400 rather than the current arrangement of a $900 pay check and $500 in cash. (Meyer Decl., Ex. B, at Tr. 16:22–17:7.) The Plaintiff testified that he asked for his entire $1,400 salary to be put "on the books" because he was trying to buy a house, and in order to qualify for a loan, his bank requested documentation showing that his salary was $1,400 per week. (Id. at Tr. 11:9–18.)

According to the Plaintiff, the Defendant Gallowitsch, Jr. agreed to the Plaintiff's request but asked the Plaintiff to give him an extra $100 per paycheck to make up for the additional taxes that he would incur as a result of putting the Plaintiff's entire salary "on the books." (Id. at Tr. 12:10–17.)

In May 2011, after he closed on his house, the Plaintiff testified that he endorsed one pay check to Gallowitsch, Jr. as compensation for the additional taxes that the Defendants would likely incur. (Id.) After signing over his check, the Plaintiff allegedly asked the Defendant Gallowitsch, Jr. to restore their previous arrangement and pay him $500 of his $1400 weekly salary in cash. (Id.)

Both the Defendant Gallowitsch, Jr. and Gallowitsch Sr. denied that the Plaintiff asked them to be paid entirely on the books. (Joint 56.1 Statement at ¶ 9; Pl.'s Ex. C, at Tr. 46:20–47:8; Ex. D at Tr. 92:19–21.) The Defendant Gallowitsch, Jr. testified that the Plaintiff occasionally signed paychecks over to him but that the Plaintiff did so for the purpose of cashing his check: "I would cash them for him. So he would sign his paycheck to me and I would give him the cash." (Id. at Tr. 47:22–48:2.)

The payroll records submitted by the Defendants indicate that until January 29, 2012, the Plaintiff received pay checks for gross amounts of $900 per week and net amounts after taxes of between $736.32 and $744.48. (Meyer Decl., Ex. I, at pp. 1–99.) From January 29, 2012 to April 29, 2012, the Plaintiff received checks for gross amounts of $1,400 per week and net amounts of $1124.27. (Id. at 99–111.) On April 30, 2012, the Plaintiff received a check for a gross amount of $1,000 and a net amount of $32.67. (Id. at 111.) The record is not clear as to why the net amount of the Plaintiff's April 30, 2012 pay check is so much less than the net amounts of his other pay checks. Finally, from May 7, 2012 until the Plaintiff was terminated on April 30, 2013, he received weekly pay checks for gross amounts of $900 and net amounts of between $759.77 and $744.32. (Id. at 111–16.)

In addition to the alleged deductions for tax purposes, the Plaintiff testified that the Defendants deducted money from his salary when the Plaintiff took time off from work. According to the Plaintiff's testimony, the Defendants did not provide him with any sick days or vacation. (Id. at Tr. 141:16–24.) As a result, whenever the Plaintiff took time off, he alleges that the Defendant took money from the $400 or $500 in cash that he was paid each week. (Id. at Tr. 142:19–21.)

The Defendant Gallowitsch Jr. testified that the Plaintiff did receive paid vacation time when the restaurant closed for ten days in January 2011, 2012, and 2013. (Pl.'s Ex. C, at Tr. 33:9–25.) In addition, he testified that in the Summer of 2012, the Plaintiff was given an extra pay check of $1400, which represented his vacation pay for that year. (Id. at Tr. 34:16–25.) He further denied that he had ever reduced the Plaintiff's salary because he had taken time off. (Id. at Tr. 37:7–10.)

6

**D. The Plaintiff's Duties Prior to the Opening of Bistro 44**

After the Plaintiff was hired in January 2010, he assisted with hiring staff and creating the menu for Bistro 44.

In this regard, the Plaintiff prepared a posting on Craig's List seeking job applications for "Sous Chef and line cooks" at Bistro 44. In the posting, his email address was listed as a point of contact.

There is a dispute of fact as to how involved the Plaintiff was in the initial hiring process. The Plaintiff testified that he sat in on the interviews with candidates but described his role in the hiring process as passive:

> [I]t was probably maybe a few days or week before opening, and [the Defendant] and his father were having interviews, I guess, from an ad they posted . . . And I guess they had just asked me if I wanted to sit in on it. And, you know, being that I was just sitting there at the table, you know, doing nothing, . . . But after that day, I was never involved in the hiring of anybody.

(Meyer Decl., Ex. B, at Tr. 66:16–6.)

On the other hand, the Defendant Gallowitsch, Jr. testified that the Plaintiff "was in charge of the hiring and firing of the kitchen, the back of the house. So he had initial interviews with all of the people that were interested in the position." (Meyer Decl., Ex. C, at Tr. 202:17–20.)

The parties also dispute the Plaintiff's role in creating the menu for Bistro 44. The Plaintiff described his role prior to the opening of Bistro 44 as follows:

> I was there . . . cleaning stuff up and throwing old garbage out, and then spending . . . a few hours, also, making . . . a few dishes for . . . [the Defendant Galowitsch's] family to try out and critique and decide if this is something that they're going to put on the menu[.]

(Meyer Decl., Ex. B, at Tr. 86:16–25.)

On the other hand, the Defendants contend that the Plaintiff was primarily responsible for creating the menu for Bistro 44.  In that regard, Defendant Galowitsch, Jr. testified, "The initial menu was created by Emanuel.  He had something that he had . . . written and he brought it to us and that was the first menu that we saw basically from him." (Meyer Decl., Ex. C, at Tr. 195:23–196:2.)

It is also undisputed that the Plaintiff created lists of potential dishes and made edits to draft copies of the menu.  (Meyer Decl., Ex. N.)  Some of the Plaintiff's proposed dishes — such as "French Onion Soup," "Local Little Neck Clams," "Brown Sugar and Ancho Chile Ribeye" and "Colorado Rack of Lamb" — later appeared on the finalized menu.  (Meyer Decl., Exs. N, P.)  Some of the Plaintiff's proposed dishes did not make it into the final menu.  (See id.)

## E. The Plaintiff's Duties Following the Opening of Bistro 44

After Bistro 44 opened in March 2010, the Plaintiff described his duties as entirely related to cooking.  He testified that he arrived at Bistro 44 at 10 or 11:00 am and spent an hour prepping food.  (Id. at Tr. 147:10–14.)  From 11:00 am until the restaurant closed, the Plaintiff claimed that he spent 95% of his time cooking meals.  (Id. at Tr. 147:18–25.)  He said that during the busier spring and summer months, there were generally two other cooks alongside him in the kitchen, and during the less busy fall and winter months, it was just him and one other cook.  (Id. at Tr. 146:2–5; 149:8–17.)

He described the division of labor among the cooks during the busy months as follows:

> Alex Canales, he sort of gravitated toward the pantry side, which was deserts and salads, and proved to be good at that. So he worked that station for lunch and dinner.  Miguel proved to be very good at the grill station with temperature.  And I did the saute for lunch and dinner, . . . [s]o there was [sic] three position on the weekend:  There was saute, which was me; there was grill, which was Miguel; and then there was salads, pantry, which was Alex.  And then during the week, it was just two because it wasn't as busy.  So it would be me saute/grill, and then Alex or the other pantry guy.

(Id. at Tr. 64:17–25.)

Other than his cooking duties, the parties dispute how much authority the Plaintiff had over other matters in the restaurant.

With regard to his own schedule, it is undisputed that the Plaintiff was not required to clock in and clock out, as other kitchen staff employees were required to do. However, he testified that Galowitsch, Jr. had to approve his work schedule and that as noted above, when he took time off, his pay was docked. (Id. at Tr. 35:12–25.) However, relying primarily on the same testimony, the Defendants assert that the Plaintiff had full autonomy over his schedule and deny that his pay was docked when he took time off. (Joint 56.1 Statement, Dkt. No. 30, at ¶ 10.)

With regard to setting the work schedule for other employees, the Plaintiff testified:

> I was told by Paul how many people we needed for each day, how much each person should be working, and then I would try and come up with something, . . . that I thought was . . . what the kitchen needed. And then once I had this, I would bring it to them [Galowitsch, Sr. and the Defendant Galowitsch, Jr.], and then changes from them were made . . . on the [work schedule].

(Meyer Decl., Ex. B, at Tr. 37:19–38:3.)

The Plaintiff further testified that he had no role in hiring or firing kitchen staff employees. (Id. at Tr. 68:14–19.) By contrast, the Defendant Galowitsch, Jr. testified that the Plaintiff had the authority to hire and fire them. (Meyer Decl., Ex. C, at Tr. 203:14–25.)

Both parties point to two incidents to bolster their characterization of the Plaintiff's role with regard to personnel matters. On March 22, 2010, the Plaintiff had a disagreement with Fredy Villalobos ("Villalobos"). The Plaintiff described the incident as follows:

> [Villalobos] was being disrespectful to all of us in the kitchen . . . . [H]e left a mess around and did some other stuff . . . . I told him that . . . we all have to clean

9

up after ourselves.  And it ended up into . . . sort of like a little argument and he walked out.

(Meyer Decl., Ex. B, at Tr. 54:3–14.)  When asked if he fired Villalobos, the Plaintiff responded, "I had no right to.  And it's a no." (Id. at Tr. 54:15–16.)  Rather, the Plaintiff contended that after he walked out of the kitchen, Villalobos sent a text message to Alex Canales, another kitchen staff member, in which he stated that he was not coming back to work.  (Id. at 56:10–17.)  Thus, the Plaintiff contends that Villalobos quit and was not fired by him, as the Defendants contend.

The Defendants dispute the Plaintiff's version of this incident and assert that the Plaintiff fired Villalobos.  In support of this assertion, they rely on a Form W-4 purportedly signed by Villalobos on Feburary 26, 2010.  (Meyer Decl., Ex. S.)  On the form, Gallowitsch, Jr. wrote a note stating, "Hired for opening.  Major Disagreement w/ Chef Emanuel.  Emanuel fired on spot. Freddy left very unhappy.  I walk[ed] him out to [his] car.  He have me his extra cooking clothing."  (Id.) (emphasis in original).  Galowitsch, Jr. also testified that he overheard the argument between the Plaintiff and Villalobos, and "the last thing I heard [the Plaintiff] say is, you're fired; get your things and leave, and then he left . . . So I followed him to his car.  He gave me the clothes and I left."  (Id. at Tr. 175:13–19.)

With respect to the other personnel incident, on July 3, 2011, the Plaintiff sent a text message to the Defendant Galowitsch, Jr., "Sorry to bother u but need to let go of Daniel [Orlando] . . . [he] walked out last night and I can't blame him[.] [C]an I let him go."  (Meyer Dec., Ex. R.)  Galowitsch, Jr. responded, "Yup."  (Id.)

In regard to this incident, the Plaintiff testified, "What I was probably insinuating, because of the texting, was 'You need to let him go,' because I knew I had no right to fire anyone.  I mean, it was told to me time and time again." (Id. at Tr. 52:9–20.)  There is no dispute that following the incident, Orlando's employment was terminated.

In addition to these two incidents, the Defendants assert that the Plaintiff hired interns from the Culinary Institute of America ("CIA").  (Joint 56.1 Statement, Dkt. No. 30, at ¶ 26.) However, the Plaintiff disputes that he was solely responsible for hiring interns.  Both parties rely on the same testimony from the Plaintiff:

> We ended up having . . . three interns.  The first one just came in . . . off-the-street asking [for an internship] . . . . So even though it was an unpaid wage, I still went to my supervisor, which was Paul [Gallowitsch, Jr.], and told him . . . . And . . . he gave me the okay to have them come in[.] . . . Then, thereafter, because I guess the schooling found out that we accepted interns, there was an internship coordinator from [the CIA] that called the restaurant once . . . asking to speak with me to . . . see if . . . he could send other people there.

(Meyer Decl., Ex. B, at 129:5–14.)

With regard to training new employees, the Plaintiff testified:

> Well once I got the approval from Paul [Gallowitsch, Sr.] for what a dish should look like, . . . I actually took pictures for all of us . . . , and we had it . . . against the wall.  But there was [sic] no recipes for everything . . . . We really . . . winged it.

(Id. at Tr. 80:14–81:4.)

The Plaintiff also testified that in February 2013, three months before he was terminated, Gallowitsch Sr. asked him to create recipes for everything on the menus.  (Id. at 79:20–80:3.) However, prior to February 2013, the Plaintiff stated that there were no written recipes and instead, the cooks relied on the pictures of the dishes that he placed on the wall of the kitchen. (See id.)

The Plaintiff further testified that although he often created daily specials, Gallowitsch Sr. ultimately controlled the process:  "There would be situations where we would make things, serve, and then halfway into service . . . Paul Sr. didn't like it and we took it off."  (Id. at Tr. 82:18–21.)

On the other hand, Gallowitsch, Jr. testified that the Plaintiff had "full authority in the kitchen to create plates and meals in any way he saw fit[.]" (Meyer Decl., Ex. B, at Tr. 205:14–25.) Gallowitsch, Sr. also denied having any input as to what was put onto the menu each day: "I did not spend any time developing the menu with [the Plaintiff]. I asked him to come up with a menu and that's what he did." (Pl's Ex. D ,at Tr. 75:19–21; Tr. 102:9–103:8.)

It also undisputed that daily staff meetings were held. Gallowitsch, Jr. described the meetings as follows:

> At that staff meeting it would be Emanuel, then it would be all of the wait staff and the bar staff and then some prep cooks or line cooks . . . . [I]n the beginning Emanuel would address the floor staff, what the specials were going to be for the day. He would go over what the ingredients of all of the food items were, how they were going to be prepared, how they were going to be plated and basically put all the wait staff on the right page of how to sell everything . . . . Emanuel would start off speaking. After he finished, then I would go and talk about the rest of the floor situation. So I would talk about how many reservations we had[.]

(The Pl.'s Ex. C, at Tr. 194:7–195:7.)

With regard to purchasing supplies, the Plaintiff testified that he was not responsible for billing or paying vendors. (Meyer Decl., Ex. B, at Tr. 103:13–23.) However, he testified that he was responsible for setting the amount of goods to be ordered from the bakery and sometimes returned products to the extent that they were spoiled. (Id. at 101:5–12.) Other than the bakery, the Plaintiff maintained that he was not permitted to purchase products directly from vendors that cost more than two dollars. (Id. at Tr. 104:7–24.) Instead, he would ask Galowitsch, Jr. to purchase the products for him. (Id.)

The Defendants allege that the Plaintiff had full authority to purchase supplies from vendors. In support of this assertion, they submit what they contend is a hand-written note written by the Plaintiff to Bridget Groeger, a supplier, ordering trays of pasta, chicken, and salmon. (Meyer Decl., Ex. W.)

**F. The Reviews of Bistro 44**

On October 21, 2010, the Foodie Section of the LongIslander Newspaper featured an article with a profile of Bistro 44.  It stated:

> Chef Karrapoulos' kitchen boasts sustainable produce, all-natural chicken and no seafood on the endangered species list, and will work to meet dietary needs to make dishes vegetarian and gluten-free.  That way, nobody's left out of this great dining spot's second coming.

(Meyer Decl., Ex. X.)

The Defendants also submit an undated article from the Taste of Long Island by Sidney Scott ("Scott").  Scott wrote, "Foodies from miles around are likely flocking to the recently opened Bistro 44 . . . , blending a whole lot of Northport's signature Old World charm with a hint of modern chic, this hip eatery has taken a New American cuisine to a higher level of fine dining."  (Id.)

The Defendants also attach an undated review in Newsday of Bistro 44 by Paul Gianotti ("Gianotti").  Gianotti gave the food one star; and rated the price as high, the service as "very good," and the ambience as "good."  (Id.)

Finally, Zagat gave Bistro 44 a rating of excellent for the year 2011/12 and stated, "Fans of this 'sophisticated' yet 'unpretentious' Northport New American 'love the food' served in a 'handsome setting.'"  (Meyer Decl., Ex. Y.)

**G. The Plaintiff's Termination**

In the Fall of 2012, the Plaintiff testified that he approached Gallowitsch, Jr. and asked for permission to do "some catering on the side . . . to make a few bucks."  (Meyer Decl., Ex. B, at Tr. 116:22–116:8.)  According to the Plaintiff, Gallowitsch, Jr. approved his request, and shortly after, the Plaintiff started a catering company called, "Blue Fin Caterers."  (Meyer Decl., Ex. B, at Tr. 114:24–116:11.)

On April 30, 2013, Gallowitsch, Sr. fired the Plaintiff because "[the Plaintiff] went into his catering business and he did not want to work weekends anymore and he wanted to do his catering things."  (Pl.'s Ex. D, at Tr. 139:21–140:6.)

After being fired, the Plaintiff continued to run his catering business.  The website for Blue Fin Caterers states:

> Chef Emanuel most recently was the Executive Chef of the Bistro 44 in
> Northport, New York.  A native of Northport, he created exciting New Menu's
> [sic] at the Bistro when it reopened to Rave Reviews.  His Culinary Creations
> were long remembered and had him return for an encore.

(Meyer Decl., Ex. H.)

## II. DISCUSSION

### A. Legal Standards

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."

"Where the moving party demonstrates 'the absence of a genuine issue of material fact,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In that regard, a party "must do more than simply show that there is some metaphysical doubt as to the material facts[.]" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  Further, the opposing party "'may not rely on conclusory allegations or unsubstantiated speculation[.]'" F.D.I.C. v. Great Am. Ins.

Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).

"Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." Id. (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

The FLSA § 207(a)(1) and 12 NYCRR 142–2.2 require qualifying employers to compensate employees for hours worked in excess of forty hours per work week at a rate not less than one-and-one-half times the regular rate of pay subject to certain exemptions. 29 U.S.C. §§ 206(a)(1), § 207(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 142–2.2.

Here, the Defendants contend that the Plaintiff is exempt from overtime because he qualifies under the relevant federal and New York regulations as (1) an executive; (2) a creative professional; (3) a learned professional; and (4) an administrative employee.

As these exemptions to the FLSA overtime requirement are considered to be affirmative defenses, the burden of proving that an employee is exempt rests on the employer. Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 222 (2d Cir. 2002) ("The burden of invoking these exemptions rests upon the employer.") (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 394 n.1, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). In addition, "the exemptions to the FLSA are 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" Id. (quoting Ben Kanowsky, Inc., 361 U.S. at 392, 80 S.Ct. 453).

Further, "'[t]he exemption question under the FLSA is a mixed question of law and fact. The question of how the employees spent their working time is a question of fact. The question

of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" <u>Pippins v. KPMG, LLP</u>, 759 F.3d 235, 239 (2d Cir. 2014) (quoting <u>Ramos v. Baldor Specialty Foods, Inc.</u>, 687 F.3d 554, 558 (2d Cir. 2012)).

Federal courts apply the same standards to interpreting the exemptions under the FLSA as they do to the exemptions under the NYLL. <u>See, e.g.</u>, <u>Reiseck v. Universal Commc'ns of Miami, Inc.</u>, 591 F.3d 101, 105 (2d Cir. 2010) ("The NYLL, too, mandates overtime pay and applies the same exemptions as the FLSA.") (quoting N.Y. Comp. Codes R. & Regs., tit. 12, § 142-3.2); <u>Scott</u>, 2011 WL 1204406, at *6 ("Because New York's overtime provisions mirror and/or expressly adopt federal wage law . . . federal courts evaluate New York's executive exemption by reference to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 et seq., and its attendant regulations, set forth in the Code of Federal Regulations.").

Thus, the Court's analysis of the exemptions with regard to the Plaintiff's FLSA claims will also apply to the Plaintiff's NYLL claims. <u>See</u> <u>Ramos v. Baldor Specialty Foods</u>, Inc., 687 F.3d 554, 556 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.' <u>Reiseck v. Universal Commc'ns of Miami, Inc.</u>, 591 F.3d 101, 105 (2d Cir.2010). We therefore discuss only the FLSA, and do not engage in a separate analysis of [the] plaintiffs' NYLL claims, which fail for the same reasons as their FLSA claims.").

**B. As to the Executive Exemption**

Here, the Defendants assert that the Plaintiff's overtime claims should be dismissed because they contend that they employed him in a "bona fide executive capacity," and therefore, he was exempt under the FLSA and the NYLL from receiving overtime.

The Plaintiffs respond that that there are material disputes of fact as to whether the

Defendants employed him in a "bona fide executive capacity," and therefore, summary judgment

is inappropriate on that basis.

One category of employees exempt from the overtime requirement under FLSA §

213(a)(1) are employees who are employed in a "bona fide executive capacity."

Under Department of Labor ("DOL") regulations, an employee is employed in a "bona

fide executive capacity" if the employee is:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . .;
> (2) Whose primary duty is management of the enterprise in which the employee is
> employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other
> employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions
> and recommendations as to the hiring, firing, advancement, promotion or any
> other change of status of other employees are given particular weight.

29 C.F.R. § 541.100; see also Mullins v. City of New York, 653 F.3d 104, 107 (2d Cir. 2011)

(same).

The Court will address each of these four factors, in turn.

**1. As to the First Factor**

As noted above, the first factor that an employer must satisfy to show that an employee is

a "bona fide executive" is that he is "[c]ompensated on a salary basis at a rate of not less than

$455 per week." 29 C.F.R. § 541.100(a)(1).

Section 541.602(a) of Title 29 of the Code of Federal Regulations ("Section 541.602(a)")

defines what it means to be compensated on a "salary basis":

> An employee will be considered to be paid on a 'salary basis' within the meaning
> of these regulations if the employee regularly receives each pay period on a
> weekly, or less frequent basis, a predetermined amount constituting all or part of
> the employee's compensation, which amount is not subject to reduction because
> of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.602.

Here, the Defendants assert that there is no dispute of fact that the Plaintiff earned more than $455 per week. (The Def.'s Mem. of Law at 9-10.) In that regard, both Galowitsch, Jr., and Galowitsch, Sr. testified that the parties entered into an oral agreement when they hired the Plaintiff in January 2010 to compensate him $1,300 per week, which in March 2010, they increased to $1,400 per week for the duration of his employment. (Pl's Ex. C, at Tr. 14:19-15:19; Ex. D, at Tr. 87:17-19.) The parties also do not dispute that they agreed that the Plaintiff would be paid $900 of his weekly salary in the form of a check, and the balance in cash. (See id.)

However, the Plaintiff asserts that the cash that he received from the Defendants was "subject to reductions." (The Pl.'s Mem. of Law at 8–9.) The Plaintiff is correct that "an employee will not be exempt if her salary is 'subject to reduction because of variations in the quality or quantity of the work performed.'" 29 C.F.R. § 541.602(a). However, "[s]uch deductions exist only if "there is either an actual practice of making such deductions or an employment policy that creates a 'significant likelihood' of such deductions." Coleman-Edwards v. Simpson, 330 F. App'x 218, 220 (2d Cir. 2009) (quoting Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)).

Thus, a plaintiff asserting that his salary was "subject to reduction" must allege more than isolated incidents of deductions in order to create a genuine issue of material fact as to whether his employer intended him to be an hourly employee. See, e.g., O'Brien v. Town of Agawam, 350 F.3d 279, 294 (1st Cir. 2003) ("Even taking this evidence in the light most favorable to the officers, four isolated incidents are not sufficient to show an 'actual practice' of reducing supervisory officers' compensation to punish variations in the quality of the work performed. 'The actual instances of pay reduction must amount to an actual practice of making such

18

deductions."') (quoting Spradling v. City of Tulsa, 198 F.3d 1219, 1224 (10th Cir. 2000));

DiGiore v. Ryan, 172 F.3d 454, 464–65 (7th Cir. 1999) (five isolated incidents insufficient to

show actual practice); Martinez v. Hilton Hotels Corp., 930 F. Supp. 2d 508, 522 (S.D.N.Y.

2013) ("[T]hree suspensions among five employees over a period of four years is, in this case,

too isolated an occurrence to suggest Defendants had an 'actual practice' of making unlawful

deductions from the Plaintiffs' salaries.").

Here, the Plaintiff testified that in April 2011 he gave the Defendants one entire pay

check to compensate them for putting his entire salary of $1,400 "on the books" for a period of

six months. (Meyer Decl., Ex. B, at Tr. 12:10–17.) In addition, he testified his salary was

generally subject to deductions when he left work early for personal reasons but could only point

to two particular instances when the Defendants reduced his pay: namely, when he left work to

attend the birth of his son; and when he left work after experiencing symptoms of heat

exhaustion. (Id. at Tr. 144:9–145:8.)

Other than these three incidents, the Plaintiff points to no evidence suggesting that the

Defendants had an "actual practice" of docking employees' pay for partial absences. For

example, the Plaintiff does not submit evidence of a formal policy favoring pay deductions or

testimony from other employees at Bistro 44 indicating that their weekly salaries were also

docked by the Defendants for leaving work early. See Yourman v. Giuliani, 229 F.3d 124, 130

(2d Cir. 2000) ("[D]etermining what constitutes an "actual practice" of pay deductions . . .

necessarily involves consideration of additional factors such as the number of times that other

forms of discipline are imposed, the number of employee infractions warranting discipline, the

existence of policies favoring or disfavoring pay deductions, the process by which sanctions are

determined, and the degree of discretion held by the disciplining authority.").

Therefore, even if true, the occurrence of three instances when the Plaintiff's pay was docked is not sufficient to create a genuine issue of material fact that would preclude the Court from finding that the Plaintiff was "[c]ompensated on a salary basis at a rate of not less than $455 per week." See O'Brien, 350 F.3d at 294 ("Even taking this evidence in the light most favorable to the officers, four isolated incidents are not sufficient to show an 'actual practice' of reducing supervisory officers' compensation to punish variations in the quality of the work performed. 'The actual instances of pay reduction must amount to an actual practice of making such deductions.'").

Therefore, the Court finds that the Defendants met their burden with regard to the first factor of the executive exemption test. However, as is made clear below, the Court finds that there are genuine issues of material fact as to the remaining three factors which preclude summary judgment.

### 2. As to the Second Factor

As noted, in order to show that an employee was employed in a "bona fide executive capacity," the employer must show that his "primary duty is management of the enterprise." 29 C.F.R. § 541.100.

The relevant regulations defines "management" as:

activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; . . . providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). To determine whether a plaintiff's performance of management activities constitutes their primary duty, a court must consider "the character of an employee's job as a whole," and in particular, the following factors:

> (i) "the relative importance of the exempt duties as compared with other types of duties"; (ii) "the amount of time spent performing exempt work"; (iii) "the employee's relative freedom from direct supervision"; and (iv) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee[.]"

Mullins v. City of New York, 653 F.3d 104, 107 (2d Cir. 2011) (quoting 29 C.F.R. § 541.700(a)).

In the present case, the Defendants acknowledge that there is a factual dispute as to how much time the Plaintiff spent cooking in a given day versus performing management activities. (The Defs.' Mem. of Law at 11.) However, they assert that this dispute of fact is not material because it is undisputed that the Plaintiff performed managerial functions that were more important to the Defendants than his non-managerial functions. (Id.)

In response, the Plaintiff asserts that there are genuine issues of material fact as to whether he performed managerial duties while working at Bistro 44 and there is no evidence suggesting the relative importance of his alleged management duties to the Defendants. (The Pl.'s Opp'n Mem. of Law at 10.) The Court agrees.

In this Circuit, courts have found that a chef's "primary duty" is not management where his duties primarily entail cooking. For example, in Solis v. SCA Rest. Corp., 938 F. Supp. 2d 380, 396 (E.D.N.Y. 2013), after a bench trial, the court concluded that management was not the primary duty of a plaintiff-chef because:

he spent the vast majority of his day cooking food . . . . He did not have keys to the restaurant, interview prospective employees, or determine the salaries or schedules of other employees in the kitchen . . . . Although the amount of time that Mr. Pastor Alfaro spent cooking is not dispositive, defendants have not introduced sufficient evidence that his 'primary duty' was, in fact, management.

Id. at 397; see also Garcia v. Pancho Villa's of Huntington Vill., Inc., No. CV 09-486 (ETB), 2011 WL 1431978, at *3 (E.D.N.Y. Apr. 14, 2011) ("The Court agrees with plaintiffs. It is undisputed that during the course of his employment, Garcia's primary duty was to cook . . . . Nothing before the Court indicates that Garcia had any management duties, let alone that his 'primary duty' was management. Nor is there any evidence that Garcia directed the work of other employees or possessed the authority to hire and fire employees.'").

On the other hand, where it is undisputed that a chef's management duties were more important to his employer than his cooking duties, courts have found that the chef's primary duty is management. For example, the Defendants rely on Scott v. SSP Am., Inc., No. 09-CV-4399 (RRM) (VVP), 2011 WL 1204406, at *9 (E.D.N.Y. Mar. 29, 2011). There, the plaintiff, a unit manager for a group of restaurants and bars in the JFK International Airport, testified that she spent the majority of her time performing non-managerial tasks. Id. at *9. However, she also admitted that even when performing non-managerial tasks, she continued to supervise her subordinates. Id. In addition, the court found that "it is clear from her deposition admissions that the success of [the] [d]efendant's business was more dependent on [the] [p]laintiff's management duties than her other duties, the performance of which did not prevent her from continuing to manage her Units." Id. Based on this testimony, the court found that the plaintiff's primary duty was management. Id. at 10.

Similarly, in Scherer v. Compass Grp. USA, Inc., 340 F. Supp. 2d 942, 943 (W.D. Wis. 2004), also relied on by the Defendants, the plaintiff's testimony indicated that he supervised

other employees while he cooked, he exercised discretion on a daily basis, was paid nearly double the wage earned by the hourly employees who worked in the kitchen, and there was testimony from other kitchen staff members indicating that they regarded him as the kitchen manager.  Id. at 953–54; see also Chambers v. Sodexo, Inc., 510 F. App'x 336, 339 (5th Cir. 2013) (affirming the district court's decision granting summary judgment to the defendant on the plaintiff's FLSA claim where the plaintiff "admitted in his deposition that even during those periods when he purportedly had no management duties, he gave orders that were obeyed, conducted inventory, held meetings with the cooks, planned for upcoming catering events, and supervised the cooks, at least some of the time, in the kitchen[.]").

In Coberly v. Christus Health, 829 F. Supp. 2d 521, 529 (N.D. Tex. 2011), another case relied on by the Defendants, the defendant submitted evidence that the plaintiff's job description described him as being responsible for:

> planning meals, procuring food supplies and kitchen equipment, production of meals, directing and supervising the operation of the kitchen production staff and work flow of the kitchen personnel, overseeing the food service workers, interviewing and recommending the hiring and firing of food service workers, and participating in the performance management process for the food service workers.

Id.  In addition, the defendant submitted a declaration by the plaintiff's supervisor in which he stated that the plaintiff's duties were largely managerial and consistent with his job description. Id.  The plaintiff did not respond to the defendant's arguments or present evidence as to the executive exemption.  Id. at 530.  As such, the court accepted, as unopposed, the "[d]efendant's facts and evidence of the second, third, and forth factors [of the executive exemption test] . . . , and conclud[ed] that [the plaintiff] qualifies as an executive employee."  Id.

Here, the Plaintiff testified that he spent 95% of his day cooking.  (Meyer Decl., Ex. B at Tr. 64:17–25.)  The Defendants do not submit any evidence to contradict the Plaintiff's

testimony in this regard, but rather, contend that the Plaintiff can still be found exempt because his management duties were more significant to Bistro 44's business than his cooking duties. (The Defs.' Mem. of Law 11–12.)

The Defendants are correct that under the relevant DOL regulations, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700. However, the record here presents a muddled picture as to those "other factors": "the relative importance of the exempt duties as compared with other types of duties"; "the employee's relative freedom from direct supervision"; and "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee[.]" See id.

Here, there are no documents, such as a job description, which clearly defined the Plaintiff's job duties or his role at Bistro 44. Coberly, 829 F. Supp. 2d at 530 (noting that a job description for the plaintiff's position as senior chef listed his responsibilities as, among other things, "planning meals, procuring food supplies and kitchen equipment, production of meals, [and] directing and supervising the operation of the kitchen production staff and work flow of the kitchen personnel[.]"). Nor is there testimony from the Plaintiff's co-workers indicating what their salaries were or how they viewed the Plaintiff's responsibilities in the kitchen, which the DOL and other courts have found to be highly relevant in determining whether the Plaintiff's primary duties are related to management. See 29 C.F.R. § 541.700(a) ("Factors to consider when determining the primary duty of an employee include . . . the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."); see also Scherer, 340 F. Supp. 2d at 954 ("There is also evidence

that both defendant and the staff in both the Commons kitchen and dining area regarded plaintiff as a manager . . . . Kitchen staff considered him to be their immediate supervisor and dining area staff thought of him as the kitchen manager.").

Instead, what the Court is left with is conflicting testimony by the Plaintiff, the Defendant Gallowitsch, Jr.**,** and Gallowitsch Sr. as to what the Plaintiff's managerial responsibilities were and how important they were to the business of Bistro 44.

For example, the Defendant Gallowitsch Jr. testified that the "initial menu [for Bistro 44] was created by Emanuel.  He had something that he had type written and he brought it to us and that was the first menu that we saw basically from him."  (Meyer Decl., Ex. C, at Tr. 195:23–196:2.)  By contrast, the Plaintiff testified that while he helped to create some of the dishes for Bistro 44's menu, "Paul [Gallowitsch] Sr. was the one that was most involved with what the menu should be, what it should taste like, what it should look like."  (Meyer Decl., Ex. B, at Tr. 99:19–22.)

With regard to creating daily specials, the Defendant Gallowitsch, Jr. testified that the Plaintiff had "full authority in the kitchen to create plates and meals in any way he saw fit[.]" (Meyer Decl., Ex. B, at Tr. 205:14–25.)  On the other hand, the Plaintiff testified that he and the other cooks in the kitchen played an equal role in creating the specials:

> [O]n a weekly basis, . . . we would change the special . . . . [T]here would be a different soup, a different salad, and a different entrée, a different desert.  And a lot of times, . . . [the sous chef] would . . . make a dessert special, . . . make a salad special, . . . and it would be something he created.

 (Meyer Decl., Ex. B, at Tr. 82:4–11.)

With respect to setting the work schedule for the kitchen staff, Gallowitsch Jr. testified that it was the Plaintiff's responsibility and that he had no role in the process other than when he occasionally asked the Plaintiff to reduce the kitchen staff's hours.  (Pl.'s Ex. D, at Tr. 51:23–

52:24; 58:23–59:3.) On the other hand, the Plaintiff testified that while he often created the schedules, Gallowitsch, Jr. told him "how many people we needed for each day, how much each person should be working, and then I would try and come up with something, . . . that I thought was . . . what the kitchen needed." (Meyer Decl., Ex. B, at Tr. 37:19–38:3.)

With regard to his ability to set his own work schedule, it is undisputed that the Plaintiff was not required to clock in and clock out, as other kitchen staff employees were required to do. However, he testified that Gallowitsch, Jr. had to approve his work schedule and that as noted above, when he took time off, his pay was docked. (Id. at Tr. 35:12–25.)

Based on this conflicting testimony and the lack of objective evidence in the record setting forth the Plaintiff's responsibilities, the Court finds that there is a genuine issue of material fact as to the second factor. See Stevens v. HMSHost Corp., No. 10-CV-3571 (ILG) (VVP), 2015 WL 4645734, at *5 (E.D.N.Y. Aug. 5, 2015) ("Since it is far from clear whether plaintiff's managerial obligations were truly important enough to his workplace to classify them as his primary duties, summary judgment must be denied."); Awan v. Durrani, No. 14-CV-4562 (SIL), 2015 WL 4000139, at *12 (E.D.N.Y. July 1, 2015) ("These factual inconsistencies prevent a meaningful examination of whether Awan's job responsibilities rise to the level of executive management within the meaning of the FLSA and NYLL."); Clougher v. Home Depot U.S.A., Inc., 696 F. Supp. 2d 285, 292 (E.D.N.Y. 2010) ("Absent objective evidence, a more complete examination of the facts and circumstances surrounding Clougher's daily responsibilities, and credibility determinations, this Court cannot resolve this question.").

### 3. As to the Third Factor

The third factor of the executive exemption test requires the employer to prove that the employee "customarily and regularly directs the work of two or more other employees." 29

C.F.R. § 541.100(a). As discussed above, there is a material dispute of fact over the extent to which the Plaintiff supervised other employees on the kitchen staff. He testified that he rarely disciplined employees and described the cooking process as collaborative:

> Alex Canales, he sort of gravitated toward the pantry side, which was deserts and salads, and proved to be good at that. So he worked that station for lunch and dinner. Miguel proved to be very good at the grill station with temperature. And I did the saute for lunch and dinner, . . . [s]o there was [sic] three position on the weekend: There was saute, which was me; there was grill, which was Miguel; and then there was salads, pantry, which was Alex. And then during the week, it was just two because it wasn't as busy. So it would be me saute/grill, and then Alex or the other pantry guy.

(Meyer Decl., Ex. B, at Tr. 64:17–25.)

On the other hand, the Defendant Gallowitsch, Jr. described the Plaintiff as having "full authority" over the kitchen staff. (Meyer Decl., Ex. B, at Tr. 205:14–25.)

As with the second factor, without the benefit of objective documentary evidence setting forth the Plaintiff's responsibilities over other employees, this conflicting testimony presents a genuine issue of material fact that precludes the Court from finding as a matter of law that the Plaintiff satisfies the third factor. See Martinez v. Hilton Hotels Corp., 930 F. Supp. 2d 508, 527 (S.D.N.Y. 2013) ("The second criterion of the 'duties' test — that an exempt employee 'customarily and regularly' directs the work of two or more employees — also cannot be resolved on summary judgment because the extent of Plaintiffs' authority over the Room Attendants and Housemen is disputed.").

### 4. As to the Fourth Factor

The final factor concerns whether the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a).

The DOL regulations state that in determining whether an employee has such authority, a court should consider:

> whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105.

Here again, the Court finds the record to be unclear. With regard to hiring, the Plaintiff does not dispute that in March 2010, he composed an advertisement on Craig's List for sous chefs and line cooks. Nor does he dispute that he was present during the initial interviews for the position. However, he denies making any suggestions during the interviews and stated that he was "never involved in the hiring of anybody." (Meyer Decl., Ex. B, at Tr. 66:16–6.) Again, in opposition, the Defendant Gallowitsch, Jr. testified that the Plaintiff "was in charge of the hiring . . . of the kitchen, the back of the house. So he had initial interviews with all of the people that were interested in the position." (Meyer Decl., Ex. C, at Tr. 202:17–20.)

With regard to firing employees, the Plaintiff also testified that he had no role in firing kitchen staff. (Meyer Decl., Ex. B, at Tr. 68:14–19.) By contrast, the Defendant Gallowitsch, Jr. testified that the Plaintiff had such authority. (Meyer Decl., Ex. C, at Tr. 203:14–25.)

The Defendants also submit a February 26, 2010 Form W-4 for Fred Villalobos, an employee in the kitchen of Bistro 44. (Meyer Decl., Ex. S.) On the form, Gallowitsch, Jr. purportedly wrote a note stating, "Hired for opening. <u>Major Disagreement</u> w/ Chef Emanuel. Emanuel fired on spot. Freddy left very unhappy. I walk[ed] him out to [his] car. He have him his extra cooking clothing." (<u>Id.</u>) They also submit a July 3, 2011 text message from the Plaintiff to Gallowitsch, Jr, "Sorry to bother u but need to let go of Daniel [Orlando] . . . [he] walked out last night and I can't blame him[.] [C]an I let him go." (Meyer Dec., Ex. R.)

Gallowitsch, Jr. responded, "Yup," and Orlando's employment was subsequently terminated. (Id.)

The Plaintiff disputes that he fired Villalobos and claims that the July 3, 2011 text message shows that Gallowitsch Jr., not him, had the ultimate authority with regard to firing employees. (Meyer Decl., Ex. B, at Tr. 52:9–20; 175:13–19.)

Even if Gallowitsch, Jr. gave the Plaintiff's recommendations that Villalobos and Orlando be fired "particular weight," that alone would not be sufficient to satisfy the fourth factor. That is because the DOL regulations clearly state "an occasional suggestion with regard to the change in status of a co-worker" is not sufficient to show that an employee's recommendations on hiring or firing were given a particular weight. 29 C.F.R. § 541.105; see also Costello v. Home Depot USA, Inc., 928 F. Supp. 2d 473, 489 (D. Conn. 2013) ("The court notes that the regulations state that the frequency with which an employee's suggestions and recommendations are sought and relied upon are among the factors courts should consider when evaluating this factor.").

Therefore, in light of the sparse and seemingly contradictory evidence on the record regarding the Plaintiff's authority over personnel decisions at Bistro 44, drawing all inferences in favor of the Plaintiff, the Court finds that the Defendants have not established the absence of a material issue of fact as to the fourth factor.

In sum, the Court finds that there are genuine issues of material fact as to the second, third, and fourth factors of the executive exemption test. As all of the four factors must be satisfied for the Defendants to prevail on their executive exemption defense, the Court finds that summary judgment is inappropriate on that basis. See Stevens v. HMSHost Corp., No. 10-CV-3571 (ILG) (VVP), 2015 WL 4645734, at *6 (E.D.N.Y. Aug. 5, 2015) ("Since all four factors

listed in 29 C.F.R. § 541.100(a) must be satisfied for defendants to prevail on their executive

exemption defense, however, the lack of a material dispute over this issue does not warrant

dismissal of plaintiff's suit.").

## C. As to the Creative Professional Exemption

The Defendants next contend that the Plaintiff was employed as a "creative professional"

who is exempt from overtime under Section 541.302 of Title 29 of the Code of Federal

Regulations ("Section 541.302"). Section 541.302(a) states:

> To qualify for the creative professional exemption, an employee's primary duty
> must be the performance of work requiring invention, imagination, originality or
> talent in a recognized field of artistic or creative endeavor as opposed to routine
> mental, manual, mechanical or physical work. The exemption does not apply to
> work which can be produced by a person with general manual or intellectual
> ability and training.

29 C.F.R. § 541.302(a).

According to a DOL interpretation accompanying its April 23, 2004 amendments to the

regulations governing the overtime exemptions, the "creative professional exemption" can apply

to chefs in certain circumstances. In that regard, the DOL concluded:

> to the extent a chef has a primary duty of work requiring invention, imagination,
> originality or talent, such as that involved in regularly creating or designing
> unique dishes and menu items, such chef may be considered an exempt creative
> professional . . . . However, there is a wide variation in duties of chefs, and the
> creative professional exemption must be applied on a case-by-case basis with
> particular focus on the creative duties and abilities of the particular chef at issue.
> The Department intends that the creative professional exemption extend only to
> truly 'original' chefs, such as those who work at five-star or gourmet
> establishments, whose primary duty requires 'invention, imagination, originality,
> or talent.'"

Defining and Delimiting the Exemptions, 69 Fed. Reg. 22122-01.

"While 'the Department of Labor's interpretations of its own regulations are not binding

and do not have the force of law , . . . we will generally defer to an agency's interpretation of its

own regulations so long as the interpretation is not plainly erroneous or inconsistent with the law."' Pippins v. KPMG, LLP, 759 F.3d 235, 242 (2d Cir. 2014) (quoting Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 559 (2d Cir. 2012)).

Here, neither party argues that the DOL's interpretation of the "creative professional exemption" as it relates to chefs is either erroneous or inconsistent with the law. Nor has the Court identified any legal authority disagreeing with the DOL's interpretation of Section 541.302 as it relates to chefs. Thus, the Court defers to the DOL's interpretation and finds that a chef can be a "creative professional" exempt from the FLSA overtime requirements under the particular circumstances identified by the DOL — namely, if the court finds that "the chef has a primary duty of work requiring invention, imagination, originality or talent, such as that involved in regularly creating or designing unique dishes and menu items[.]" Defining and Delimiting the Exemptions, 69 Fed. Reg. 22122-01.

The Defendants assert that it is undisputed the Plaintiff was a "truly original chef" because he "created unique dishes" and Bistro 44 is a "gourmet establishment." (The Defs.' Mem. of Law at 21.) In support of the latter assertion, the Defendants submit a document showing that Zagat rated Bistro 44 as excellent for the period 2011 to 2012, when the Plaintiff was the executive chef. (Id.)

Again, the Court finds that material disputes of fact preclude it from finding that the Plaintiff is a "creative professional" exempt from the FLSA and NYLL overtime requirements. As noted above, the Plaintiff testified that his primary role was cooking "on the line" with other cooks. He further stated that while he did develop some of the dishes, "Paul [Gallowitsch] Sr. was the one that was most involved with what the menu should be, what it should taste like, what it should look like." (Meyer Decl., Ex. B, at Tr. 99:19–22.)

The Defendants dispute the Plaintiff's testimony, relying primarily on the testimony of Gallowitsch, Sr. and Gallowitsch, Jr. They also point to the website of Blue Fine Catering, the Plaintiff's catering company, which describes the Plaintiff's job at Bistro 44 as follows: "[The Plaintiff] created exciting New Menu's at the Bistro [44] when it reopened to rave reviews." (Meyer Decl., Ex. H.)

Even if this description is accurate, the Court notes that it does not answer the question of whether the Plaintiff's role in developing the menu at Bistro 44 was his "primary duty." On the contrary, as discussed earlier, the explanation of the Plaintiff's duties is contested by both parties.

Moreover, it is not undisputed that Bistro 44 was a "gourmet" restaurant, as the Defendants contend. While Zagat rated the restaurant as "excellent," Newsday gave it a one star review. Further, although the Plaintiff testified that he did not believe the restaurant to be "gourmet," Gallowitsch, Jr. stated that it served "gourmet" and "really high-end food." (Pl.'s Ex. A, at Tr. 151:23–25; Pl.'s Ex. C, at Tr. 110:24–111:8.)

Without making credibility determinations that are clearly inappropriate at this summary judgment stage of the litigation, the Court cannot conclude that the Plaintiff's "primary duty" was "creating or designing unique dishes," nor can it conclude that Bistro 44 was a "gourmet" restaurant. Thus, the Court also declines to grant summary judgment in favor of the Defendants on the basis of the "creative professional exemption." See Defining and Delimiting the Exemptions, 69 Fed. Reg. 22122-01 ("The Department intends that the creative professional exemption extend only to truly 'original' chefs, such as those who work at five-star or gourmet establishments, whose primary duty requires 'invention, imagination, originality, or talent.'").

**D. As to the Learned Professional Exemption**

The FLSA also excludes from its overtime provisions "professionals" whose "primary duty [is] . . . the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301.

The DOL regulations impose a three-pronged test to determine whether a primary duty qualifies for the professional exemption: the work must be (1) "predominantly intellectual in character, and ... requir[e] the consistent exercise of discretion and judgment"; (2) "in a 'field of science or learning,'"; and (3) of a type where "specialized academic training is a standard prerequisite for entrance into the profession[.]" 29 C.F.R. § 541.301(a), (d); see also Pippins v. KPMG, LLP, 759 F.3d 235, 238 (2d Cir. 2014) (same).

With regard to chefs, the regulations state:

> Chefs, such as executive chefs and sous chefs, who have attained a four-year specialized academic degree in a culinary arts program, generally meet the duties requirements for the learned professional exemption. The learned professional exemption is not available to cooks who perform predominantly routine mental, manual, mechanical or physical work.

29 C.F.R. § 541.301.

Here, the Plaintiff did not earn a four-year degree in a culinary arts program and rather, earned a two-year associates' degree from the ACI. However, the Defendants contend that the Plaintiff still qualifies as a "learned professional" because of his prior experience as an executive chef at Via Veneto in Jericho and at Café Athena in San Diego. (The Defs.' Mem. of Law at 22.)

The Plaintiff disputes that his prior work experience is an appropriate substitute for a four-year culinary degree, emphasizing that much of his prior work was in sales and

construction, which are areas that are not related to cooking. (The Pl.'s Opp'n Mem. of Law at 14.) Here again, the Court finds material issues of fact which preclude summary judgment.

The DOL has interpreted its regulations to allow "work experience to substitute for a four-year college degree in the culinary arts." Defining and Delimiting the Exemptions, 69 FR 22122-01. However, regardless of what the Plaintiff's work experience is, the DOL has stated that "ordinary cooks" who "perform predominantly routine mental, manual, mechanical or physical work" do not qualify as "learned professionals." Id.; see also Garcia v. Pancho Villa's of Huntington Vill., Inc., No. CV 09-486 (ETB), 2011 WL 1431978, at *4 (E.D.N.Y. Apr. 14, 2011) ("Moreover, the profession of a cook or a chef does not fall within the field of 'science or learning.' Finally, nothing in the record before the Court indicates that Garcia acquired any knowledge though a 'prolonged course of specialized intellectual instruction.' Accordingly, Garcia does not meet the requirements necessary to exempt him from the FLSA's coverage as a 'learned professional.'").

Here, as noted above, the parties dispute whether the Plaintiff was the equivalent of a line chef, as he contends, or a gourmet chef that performed work of a "predominantly intellectual in character," as the Defendants contend. Without testimony from other employees in the kitchen or objective documents setting forth the Plaintiff's duties, the Court is not able to resolve this factual dispute without making credibility determinations which are, of course, the sole province of the jury. Accordingly, the Court also denies the Defendant's motion with regard to the "learned professional" exemption.

**E. As to the Administrative Professional Exemption**

Finally, the Defendants argue that the Plaintiff was an administrative employee exempt from overtime.

Under this exemption, the FLSA's overtime requirements are inapplicable to employees (1) who are "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

Here, as discussed with regard to the executive exemption, there is a material dispute of fact as to whether the Plaintiff's primary duty as executive chef "directly related to management or general business operations," as the Defendants contend, or whether the Plaintiff's primary duty related solely to cooking, as the Plaintiff contends. Also, as discussed earlier with respect to the executive exemption, there is a material dispute of fact as to how much discretion and independent judgment the Plaintiff exercised with regard to the menu and the staff in the kitchen of Bistro 44. Therefore, the Court finds genuine issue of material facts as to the second and third factors of the administrative exemption test.

The Defendant is required to prove all three factors in order to demonstrate that the Plaintiff is an administrative employee exempt from overtime. Accordingly, the Court finds, as it did with the executive exemption, that the issue of whether the administrative exemption applies cannot be resolved at this stage of the litigation. See, e.g., Callari v. Blackman Plumbing Supply, Inc., 988 F. Supp. 2d 261, 284 (E.D.N.Y. 2013) (Spatt, J) ("Thus, as with the executive employee exemption, the issue of whether the administrative exemption applies to the [p]laintiff 'cannot be resolved at this stage of the litigation, because there exist disputed issues of material fact over whether [the plaintiff's] 'primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of [the Defendants or the

Defendants'] customers.'") (quoting <u>Hendricks v. J.P. Morgan Chase Bank</u>, N.A., 677 F.Supp.2d 544, 559 (D. Conn. 2009)); <u>see also</u> <u>Harper v. Gov't Employees Ins. Co.</u>, 754 F. Supp. 2d 461, 465-66 (E.D.N.Y. 2010) ("There is sharp disagreement concerning critical facts regarding the scope of [the] [p]laintiff's duties, and whether those duties allow [the] [p]laintiff to exercise the discretion and judgment required to characterize her position as exempt. The Second Circuit has indicated a very narrow interpretation of the FLSA administrative exemption, and this court's holding can be determined only upon a clear finding of facts. Because [the] [p]laintiff has raised important questions concerning those facts, summary judgment must be denied.").

In conclusion, the Court finds that the Plaintiff has raised genuine issues of material fact as to whether he is exempt from the overtime requirements of the FLSA and the NYLL. Accordingly, the Court denies the Defendants' motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, the Court denies the Defendants' motion for summary judgment.

**SO ORDERED.**
Dated: Central Islip, New York
August 31, 2015

_/s/ Arthur D. Spatt___
ARTHUR D. SPATT
United States District Judge